Good morning, your honors. Thomas Hudson on behalf of the appellants and with me at council table today is Kimberly McMath, in-house counsel for STMicroelectronics. I hope to save three minutes for rebuttal and understand it's my obligation to do so. I plan to address two principal issues this morning, the two principal issues on which this appeal turns. First, could the plan administrator in this case examine the extrinsic evidence of intent in interpreting the retirement plan at issue in this case, the PRP also referred to as the restoration plan, which is a top hat plan. Second, if the administrator, called the retirement committee in this case, could examine that extrinsic evidence, can it be said that the plan or acted unreasonably in concluding that Mr. Santoni was not eligible for benefits? Now, turning to the first issue, could the retirement committee look at extrinsic evidence? It is sort of axiomatic that the first principle of contract interpretation, the number one goal of contract interpretation, is to ascertain the party's intent. And I hear that, but that's maybe a dangerous road for you. I thought a lot about this. And to begin with, when you talk about party's plural intent, you don't have a great analogy in contract law. This isn't something that's actually negotiated with the other party here. Well, true, Your Honor. It's a unilateral contract, but it's also a top hat plan, which is the kind of ERISA plan that Congress has recognized does have more of the characteristics of true contract. These are the highly paid executives who end up administering the plan. So I think that it is fair to talk about intent. But let's look at the next point, that all the authorities agree that in all the ERISA context, that whenever there is a latent ambiguity or extrinsic ambiguity, then it certainly is fair game to look to extrinsic evidence of intent. And in this case, the key phrase at issue, any person who is not a citizen of the United States contains a latent ambiguity. And specifically, it is that phrase is unclear when it says, is not a citizen of the United States. It is unclear whether that, what that means with respect to when it had to be the case. The word is. I mean, President Clinton is famous for saying it depends what the meaning of the word is, is. But is is a present tense word, isn't it? But that's the ambiguity, Your Honor. In other words, what it says is not a citizen of the United States. Does that mean is or was not a citizen of the United States at any time? Or does it mean is not a citizen of the United States at the present time? Well. No, no. Go ahead. If you're sitting in a court or taking a deposition and you've been sworn to testify under oath and you're asked, are you a citizen of the United States, would you expect the answer to be based on current status or what might have been true in the past? Well, I take your point, Your Honor. But my point here is that when you look at the surrounding circumstances of this plan, what it shows is the phrase in this case is not a citizen of the United States is ambiguous with respect to whether it was really intended to mean is or was not a citizen of the United States. I think you have a good argument with regard to surrounding circumstances. It becomes more difficult to describe that as an ambiguity that's discernible from the terms of the plan itself. Well, I agree with that. But we're talking about a top hat plan and we're talking about whether it was permissible. My first point is whether it was permissible for the plan administrator to look at extrinsic evidence. And I think that demonstrates. And I guess my point is I want to talk about the extrinsic evidence because it is so powerful. But in this particular top hat plan specifically said that the plan administrator may correct omissions or correct defects or supply omissions. Now, granted, that doesn't mean the plan administrator can do whatever it wants, but it certainly suggests that it's appropriate to look to extrinsic evidence. So we would submit as a first principle that the extrinsic evidence could be examined in this case, in the context of this case, to ascertain intent. Now, let's talk. Let me turn to my second point. And let's talk about that extrinsic evidence. And before I do, I want to make a bigger point because I think it's important. It would have been illogical for the company to adopt a retirement plan that created differences among naturalized citizens and native-born citizens. Indeed, it would raise thorny issues of natural origin discrimination. Yet the interpretation adopted by the does just that. It creates sort of a super special category for naturalized citizens where they get the best of both worlds. Under the district court's interpretation, a naturalized citizen gets all the benefits, all the retirement benefits that a native-born citizen does, plus all the benefits that someone otherwise eligible for foreign pension benefits gets. They could have put a no double dipping clause in if they wanted to. Well, my point is it would be illogical for the company to create a double dipping clause that made a super class of citizen based on naturalized status. But we're imagining a lot of things. And while we imagine, maybe it's really great to get these great Italian people to come over and work in the United States so they could care less what the Italians do with their retirement system. If you're a citizen, when you retire, you get it. So I mean, we're imagining a lot of things that I don't think are in the record. Well, you bring me actually to my, let's talk then about the extrinsic evidence, Judge Archer. And that really brings me to the first point is when you look at when this plan was adopted, when the PRPNP and related CERP plans were adopted, the evidence is clear that the intent wasn't to give sort of special privileges to naturalized citizens. Well, let's stop right there and make sure I got the correct chronology. He became a citizen before the plans were adopted. That's correct. Assume that the company keeps records of their employees. Correct. And I think that citizenship would be very, very important in an international company to know who's a citizen or not, because you have various problems with green card people and whatever. So when they adopted the plan, they knew darn well that this guy was a citizen, if you want to make assumptions or extrapolations from the extrinsic evidence. So what do you do with that? Well, my point is when you look at the evidence of when the plan was adopted, what the company was facing in part, and one of the reasons the company adopted the PRP plan, was to eliminate internal disparities between those eligible for foreign pension plans and those who were not. At the time, citizens or individuals like Mr. Santoni and others were eligible to receive these generous foreign pension plans, including those specifically designed for executives, the Deragente. So the company adopted the PRP and the related CERP plan in part to eliminate that internal competitive advantage that those eligible for foreign benefits had. But that's not all. That's not all we have in terms of the extrinsic evidence. There was then an amendment to the related CERP plan shortly thereafter, and that resulted from issues raised by those eligible for foreign benefits. And what was the issue? It wasn't that, gee, we're not getting the PRP benefits. No, the issue was that we're not getting the same minimum guarantee under the CERP. And documents created at that time, well before this make unequivocally clear that the company's intent and that the understanding of everyone involved at the time was that the company did not intend to provide someone eligible for foreign benefits the PRP benefits. And, again, that's extrinsic evidence that's in documents that predates any dispute in this case. And that's not all. But go ahead, Judge. I have a question, because you raised a phrase that I've had a problem with, eligible for foreign benefits. When he became a U.S. citizen, is there anything in the record that shows that he's still eligible for foreign benefits, or was he eligible before, had gotten those benefits accruing, and then when he became a U.S. citizen, he no longer got any more, or does it make any difference? Well, the answer is that the company continued to contribute to his foreign pension benefits so that he would be able to receive those. And internally, when we talk about, let's talk about the company. Stop there a minute. Is that part of an employment contract? Why do you do that? I don't know the answer why. I assume it has something to do with the way the foreign pension plans work. I don't know. Again, they have the records. They know he's a citizen. Right. And they're contributing to his foreign pension plan. What the record does show is that the company intended to continue the foreign  pension benefits. This is in the affidavit from Laura Smith under ER44, that had the company discontinued, stopped paying them, those benefits would have been lost. But here's the point, is that the company, there were employees eligible for foreign pension benefits, and there were other employees initially adopted to eliminate that disparities. But let me talk about the third, and sort of looking specifically at how the company understood the issue. One, we have what it intended to do at the time. Two, we have the amendment and documents created at the time. Three, and I think this is particularly powerful, we have the statements that were issued to Mr. Santoni, and internal documents from the company, indicating that he's not eligible for the PRP benefits. Mr. Santoni is given statements that list as a category of benefits the PRP. And those statements show zero under that category. And he says nothing about it at the time. And we attached a sample of that to our opening brief. So, point one, could the company look at the extrinsic evidence? Point two, if it does so, can we say that the administrator acted unreasonably? We would submit that given that powerful objective evidence, that cannot be said. And let me sort of make another big picture point. Suppose this, I mean, look, we all know this is an unusual case. But suppose it were flicked. Suppose what happened here is that we had a written plan document that suggested that Mr. Santoni got zero when he retired. Yet we had all this evidence, internal company documents, statements, documents that predated the dispute that said, yes, he should be getting benefits when he retired. Is there any doubt that the plan administrator could construe the plan to provide an individual like that benefits? And if so, is there any doubt that the retirement committee had the discretion to do what it did in this case? Well, there's a difference here. In the case you just described, the company's paying out more of its money. And in this case, the company winds up paying out less of its money. So the company's own motivation, not great in the context of a large company. But still, it's a plus or a minus. In this case, it's a minus. Fair enough. But my point is, look, if you had such powerful extrinsic evidence, we all know what the answer would be. I see that I'm just under four minutes, unless the Court has more questions on these issues. I'll pose one. And for me, this case has been difficult, because I understand your argument with regard to intent. And I also look at, well, but who drafted these documents? I mean, I remember explaining to clients before who tell me, well, I drafted this document. I know what it's supposed to mean. And in a contract world, that's not a good position to take, because the contract's going to be read against the drafter. And the fact that you drafted the document doesn't give you extra privilege to know what it means. Why shouldn't it cut against the drafter of the document? And I take your point, Judge Clifton, and it's a good one. But I think the answer to that question in this case has to do with the fact that this is a top-hat plan and the fact that this top-hat plan gives the administrator the authority to supply omissions and correct defects. And, again, you know, in cases where you have an ambiguity that could go either way, that's probably the appropriate approach. But in this case, the evidence, I mean, again, it would just be crazy for a company to sort of give a super-class status to naturalized citizens, and we know when you look at it, all the evidence, the statements, the internal documents before the dispute show that that's not the case. So in this case, under those circumstances, we think that the fact that it was drafted is not dispositive. And I'll save my remaining time for rebuttal. Thank you. Good morning, Your Honors. I'm Daphne Rehm. I represent San Antonio. I have, of course, an outline, but based on the comments that I just heard, I'll address a couple of things out of order. First of all, obviously, any evidence that's going to be extrinsic and considered needs to be reliable, needs to be objective evidence. I think in this case, certainly, there's a big question as to whether the evidence is objective and reliable. Let me go right to that, because as I look at this, it seems to me it's difficult not to infer that there was not an intent to specially reward the position your client happens to be in. And he's going to get a substantially, if he prevails, and as he has in the district court, he'll get a substantially larger amount than otherwise he would. And I don't see any logic behind why the company would want to specially reward him, because he happens to be both a current U.S. citizen and the recipient of an Italian pension. I think that's a valid question. But I think if you do look at the numbers and compare the percentages, because that's what these plans are entitled, or that's what the intent of them is, is to make sure that people that are with the company for over 20 years, in the case of the CERP, the PRP didn't make any distinction between years, but to make sure that these people who have been there for so long get a certain percentage of their final salary. It's not just a regular 401K that you put into, and then you get whatever your reward is from that. It's actually based on what their salaries are. And in this case, even though there might be a slight distinction between the numbers, you can't compare, for example, Executive Number 12, we use him because we just have those numbers, with Mr. Santoni and say, well, Mr. or Executive 12 has more in his 401K than Mr. Santoni. Well, Mr. Santoni was also paying into the Italian plan. So there's differences between those. You can't compare the two employees, but you can certainly compare their numbers as ratios of their salaries. And those were very, very similar, even if you take into consideration this. But the CERP was aimed at producing a 60 percent minimum, and Mr. Santoni is way over that. Right, but that's the CERP. And that's for people that it might give you a sense of what that you talk about percentage of compensation. Doesn't that give you a sense of what the company was aiming to accomplish? No, that really is just the goal of the CERP. And, in fact, people could qualify for that if they were only there for 20 years. That didn't have anything to do with the people that were there for 35, 40 years. Those people were in an entirely different category, as the PRP shows, because the PRP specifically says, hey, you can use all of your years. And then if you aren't here long enough to get up to what some of the other people are, we're going to guarantee you at least 60 percent. So that was a guarantee of the CERP. It had nothing to do with the PRP, and it certainly did not limit the PRP, as you can see from Executive Number 12's numbers, who, S.T. agrees, is entirely liable or entitled to them. I don't know if this is relevant, but something struck me. This is an international company, many countries. So this is not something unique, like it dropped out of the sky and hit somebody on the head one day. It must be very common to have international people all over in their offices, and so nationality and how they fit into these situations has to be very commonplace. I would think. I don't know that. That's the nature of the company. So, I mean, the fact that he was an Italian national, they hired him, he came to the United States, he was getting an Italian pension plan contribution, wouldn't be unusual. I mean, the fact it's recognized in the plan. And I don't think that if you have that many people working and you keep records, that if someone then becomes a United States citizen, that's not going to be an unusual event. It doesn't seem like this is some catastrophic event that requires, wow, there's an ambiguity. What's ambiguous here? I mean, can you answer the ambiguity question for me? I mean, I heard that explanation. Answer what your thought of this ambiguity question is. I think if the company had an intent in providing benefits, it didn't share that intent with everybody. Certainly, as far as Tony Santoni was concerned, it advised him that he was entitled to the benefits. He just got told that he was advised that he wasn't entitled to the benefits. No, no, no, no. I'm sorry. In January of 98, when they started this new exec program, that's a distinction, interestingly enough, that you can see between Mr. Santoni and the foreign executives. ST would like to lump them all together and say, well, he was one of them, and they're not entitled to it, so neither is Mr. Santoni. But that's not the case because, actually, the foreign executives, and I'll give you the exhibit number. That's in ER 49. I think Mr. Ruben Sononi is listed in, actually, it's 44, exhibit 14. That's their example of a foreign executive who doesn't get benefits. And if you look at the e-mail that was sent to Mr. Santoni on January 8th, that's exhibit 49, or ER 49, exhibit 1. That e-mail went out to all the different execs that were entitled to the benefits. And Mr. Santoni's name is on it. He got that e-mail. But if you look for Mr. Sonino's on there, who they say was a foreign executive that wasn't entitled to the benefits, his name's not on there. What does this attach to the brief, the opening brief? What does that do? That actually shows the disparity between the benefits that Mr. Santoni will get. But what I think it was added in was to show that the benefit statements are this pure proof that ST never intended Mr. Santoni to get these benefits. And here's the example because they're not listed, which is even a better argument for Mr. Santoni because ST says we didn't list these benefits on these statements. Therefore, he's not entitled to them. And that shows that we never intended that to be. And I laughed when I read it because it was such a ‑‑ it was so silly. ST argued at one point that looking at the different statements, the benefits, that Santoni, he says, Santoni does not dispute the content of the benefit statements but downplays the weight by citing the disclaimer. And then ST goes on to say decisively nothing in the disclaimer even remotely suggests that Santoni may lay claim to entire benefit or category of benefits not even listed on the statement. That was on, I think, page 11 of their reply. Well, here's what it means. Supposedly now this is objective, reliable evidence that shows ST's intent and right to deny the benefits. But if you look at the statements, the qualified plan benefits aren't on there either. And Mr. Santoni said, hey, wait a second. I qualify for these. I fulfill the criteria. And ST said, oh, you're right. We made a mistake. We didn't mean to put that clause in there. We're going to give you these benefits because you fit through that loophole. I thought that the purpose of this exhibit, if I'll let counsel talk about it, was to show that this showed extrinsic evidence that the intent in adopting the PRP, the PRP was that Santoni would not be entitled to them and that this particular exhibit shows that intent. That I believe is what they submitted it as, that this shows that since we don't list these. Why doesn't it? Well, because that's simply a benefit statement that was sent to Mr. Santoni. And the benefit statement is fraught with error. It says, by the way, don't rely on this. That's the information, the disclaimer that they left out. That's why. The disclaimer that's on this? Oh, yeah. Yeah, one that says basically these are not reliable, basically, so we'll have to redo these when you actually retire. That may mean that the percentages or the numbers are not reliable. But does that also mean that the availability of the PRPA is not reliable, too? That's exactly the point that S.T. made. Point of sending out the statement. Well, let me go back to address, true, because as S.T. says, decisively this shows that if he's not entitled to them, he doesn't get them. But decisively what it showed was the benefit statement showed that Santoni wasn't entitled to the qualified plan benefits, but it gave them to him. In other words, those are completely unreliable, nonobjective evidence. Raise another question, which is sort of a silly question, but does it raise the question that Santoni has to know from day one that he absolutely is going to get these benefits, all the benefit he's claiming now, or can he wake up some day and say, whoops, I'm entitled to these? What does his knowledge, that seems to say you had knowledge of this and we had knowledge and we're all on the same page. Well, those didn't come out. Remember, Mr. Santoni, when the original qualified plan went in, which was 20 years earlier, he was a citizen already, so if he looked at those criteria, he fulfilled them. And then he gets an e-mail in 1998, not 2001, 1998 saying, hey, you're entitled to these benefits. So for all of these years, he just assumes that he qualifies because he does. And suddenly in 2001, he gets statements that, first of all, say, by the way, these might be wrong, and no kidding, they were wrong. They didn't say that he was entitled to retirement or the qualified plan benefits, but he got them, STB, and then he got them. ER-49 Exhibit 1 is in contravention to that document, contradicts that document. ER-49-1 certainly says that Mr. Santoni, you're entitled to these new executive benefits, and that doesn't list them, sure. And it also shows, or 49-1 also shows that ST didn't really consider him as one of the foreign executives because they didn't send that e-mail to, certainly not Ruben Cedeno, who they allege is not entitled to them. Did you answer the ambiguity question? I think the ambiguity is an argument that was raised suddenly now, but was never raised before. And if you look at the e-mail trail, it shows that that's just this new argument that came up, because when Mr. Santoni first was advised, okay, well, we'll give you your qualified plan benefits and your PRP benefits, and there's $70,000 or whatever the amount was, because there was a mistake in the qualified plan. And there was no discussion about there's an ambiguity. And, in fact, like two or three e-mails later, there was discussion regarding, oh, we used the wrong date, oh, you're right, we need to redo these calculations. And then when Ms. Smith found out how much the benefits were, she said, oh, wait a second, you're not entitled to them. But all of those discussions, including the internal ones between the retirement committee and Mrs. Smith, there's no discussion of ambiguity. It's all discussion of, gosh, we put this term in this exception and it wasn't supposed to be there. There's no ambiguity. They made a mistake, Mary. They amended the plan after this incident. Is that correct? Yeah. And the ambiguous term was in two different places. I don't remember. How did they amend the plan? They just took the term out. And if it's ambiguous, then shouldn't that ambiguity also apply to the first exception, which would mean that Executive 12 isn't entitled to benefits, because he was foreign before and accruing benefits. He's now a United States citizen, but he doesn't have a permanent visa. But you say he's entitled to the benefits. So if there's an ambiguity there, then it has to be applied to the term in both of those exceptions, and even ST's not doing that. So it's not an ambiguity, it's a mistake? It's a mistake. I think the district court was right. And like I said, or like Mr. Santoni raised in his motion to strike, this isn't an argument that was ever raised before. This ambiguity that not a citizen of the United States actually means one who began accruing benefits while not a citizen was never raised before the opening brief. It never came anywhere. It wasn't addressed by ST in their documents, the e-mail trail, either with Mr. Santoni or between themselves. It was never addressed with the district court. The administrative structure of the retirement committee. Correct. Correct. It was always a mistake. We didn't mean to put that clause in there. And the district court said, well, you can't just take terms out. You can't rewrite a policy or a plan. If it's certainly a unilateral intent or your ST's sole intent that's not anybody else's, they can't just rewrite it. Why not? Well, first of all, it's not the mutual intent. If there's going to be a reformation. It's really a mutual intent. I mean, the company's defining this themselves. It's basically a unilateral contract. But if we've reached the conclusion, you know, it was a mistake, but it was a mistake. It was never intended to produce the result that it's produced in this context. Why is it that the plan administrators precluded from saying, well, we know what it's supposed to be and this is what it's supposed to be, so this is what it's going to be? Well, just pure contract principles. Take this even out of the top hat planning. If you just look at pure contract principles, when there's a unilateral contract and somebody performs under it, in this case, well, since at least the time that the qualified plan came into being, Mr. Santoni's continuing to work there. Nobody bothers to tell him, oh, you know what? This isn't supposed to be here, so pretend it's not. Now to suddenly go back and change that is just simply, even under general contract principles, just not okay. That's a reformation that if it's made to because there's been a mutual mistake, that might be one thing. But to clarify a unilateral mistake, that's just not done. That doesn't fall anywhere within general contract principles. If it's a scrivener's error, it's an error. It's not something that can be explained away by an ambiguity, as artful as the argument. It doesn't seem to be scriveners. They just looked at these terms, applied it to this case, and said, whoops, this doesn't really work. And the mechanics of the agreement apparently didn't fit their policies, so they changed the mechanics of the agreement. I don't think it was the scriveners' error that somebody put the wrong word in. They just said, these mechanics don't work. And I think the counsel was arguing that as what was the intent when they put it together. Well, they said, gee, we're going to change our intent because it isn't working right. It was nobody put the wrong word in that I know on this record. Well, I think the clause is wrong. The part of that exception that says not a citizen of the United States. Well, not a citizen, that's very clear. The question is what import does that clause have? I think it's the construction of the agreement that counsel is arguing about and why it was put together in the intent. Well, I'm over my time. The policy or the plan, the language of the plan, it can't be interpreted to simply take out a term to deny benefits to somebody. That's not okay under any standard whatsoever. And to say that this unspoken intent suddenly now allows ST to make those changes to deny the benefits is not supported anywhere either. And the disparity and the inconsistency in awarding RP benefits, the qualified plan benefits, but then turning around and saying, well, even though it's the same language, suddenly now this creates an ambiguity is inconsistent. Thank you. Just a few quick points, if I may, and, of course, answering any other questions the panel has. Judge Archer and the panel, just with respect to the statement, what this does show is that there's a category here, the PRP benefits in white, that don't appear on Mr. Santoni's statement, notwithstanding the box showing that if they were going to appear, they would be there. Now, what's the disclaimer that was mentioned by President Counsel? We did address this in our reply. The disclaimer says the benefits shown on the statement are approximations. In other words, the amounts are approximations, not categories or approximations that we're telling you. So that is the extrinsic evidence, and it's objective with respect to the statement. Now, with respect to the January 1998 e-mail, there's evidence that after that e-mail was sent, it was explained to Mr. Santoni that he's not eligible for the PRP. And, of course, we know that one of the that was talking about the CERP and the PRP on that e-mail, and he did become eligible for the CERP. We also know that after that e-mail, he gets these statements and says nothing. Well, why didn't he say anything? Because he was told and understood he wasn't eligible. This change in there was some mention about the change in position after the benefits calculation. That's very much a red herring and contradicted by the record. The e-mail that opposing counsel mentions is dated June of 2002. We cite in our reply brief the April 2002 e-mail that predates this, where, again, it said Mr. Santoni explicitly. Mr. Santoni is not eligible for the PRP, again, before any dispute arose. And the retirement committee, it's undisputed, when they made the decision to deny benefits, they didn't have any dollar amounts in front of them. These calculations weren't before the retirement committee. So it couldn't have had any impact on the position. Bottom line is it's an absurd interpretation to suggest that the retirement committee or the company intended to give naturalized citizens some special category. We have, again, unusual circumstances in this case, document after document that predates dispute that shows the true intent. We accordingly ask the court to reverse and remand for entry of summary judgment in the appellant's favor. But at a minimum, if the court doesn't believe that that's appropriate, we would ask that the court reverse and remand for a trial to resolve any disputed questions of fact. Let me ask you one question about the charter graph or whatever. Yeah. I take it what was sent to him, and this puts two together. It does, yeah. He was sent the top. He was sent the top. That's correct. And there's a footnote on this page that says his SERP benefit is very large because it's not yet been offset. I take it he did not receive that red part? He did, Your Honor. In other words, there's no issue in this case. Again, the SERP, and I think somebody commented on this earlier, it's designed to guarantee a minimum 60 percent of pre-retirement salary. He did receive that. The point you're trying to make is that the yellow part, which we see on the lower graph, he didn't have any what's colored yellow here. Correct. Notwithstanding, if you look at his statement, see, there's a space for it. On his statement it says pension restoration plan, the PRP. And, again, as counsel pointed out, he knew about that category of benefits, and he's getting statements showing that he's not receiving any, and that's consistent with the company's internal composite listings showing that he's not on that plan. Thank you, Your Honor. Further questions? There you go. Thank you. We thank both counsel for the argument. The case just argued is submitted. Okay. We'll take a brief recess as the counsel reassemble. We'll be back in about five minutes. So we're going to. Thank you.
judges: Brunetti, Clifton, Archer